IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAYMOND PAUL NELSON,

        Plaintiff,              Case 2:06-cv-1289 LKK KJN P

    vs.

D.L. RUNNELS, et al.,

        Defendants.       FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Defendants move for summary judgment (Dkt. No. 69) on plaintiff's Second Amended Complaint ("SAC") (Dkt. No. 17) filed April 11, 2007.  Plaintiff is a former state prisoner proceeding without counsel and in forma pauperis with this action filed pursuant to 42 U.S.C. § 1983.  Plaintiff was released from prison on March 22, 2009, and now resides in Woodland, California.  (Dkt. No. 69-4, at 15; Dkt. Nos. 52, 53, 62-64.)  This action proceeds against remaining defendants Amero, Dangler, James and Smith, employees of the California Department of Corrections and Rehabilitation ("CDCR") at High Desert State Prison ("HDSP"), for alleged violations of plaintiff's rights under the First and Eighth Amendments to the United States Constitution.

        Plaintiff alleges that he was transferred to HDSP, a Level IV prison, in June 2003,

1   from California State Prison-Solano ("CSP-S"), after correctional officers there "stockpiled"

2   rules violation reports ("RVRs") against plaintiff for refusing to cut his hair.  The issues in this

3   case have been narrowed by this court's order filed March 19, 2009 (Dkt. No. 51), adopting

4   findings and recommendations filed January 28, 2009 (Dkt. No. 49).  Remaining are plaintiff's

5   contentions that throughout his incarceration at HDSP, defendants acted in retaliation against

6   him for filing administrative grievances ("602s") challenging, inter alia, restrictions placed on

7   plaintiff that were allegedly inconsistent with privileges associated with his program status.[1]

8   Plaintiff alleges that defendants retaliated against him when they twice denied him attendance at

9   religious services, and then by transferring him to another housing unit where plaintiff was

10  assaulted by other inmates.  Plaintiff contends that defendants violated his First Amendment right

11  to the free exercise of his religion and to file administrative grievances, and his Eighth

12  Amendment right to be free from foreseeable harm and to obtain adequate medical care.

13          Pursuant to defendants' motion to dismiss filed August 20, 2008 (Dkt. No. 36),

14  the court dismissed as moot plaintiff's motion for injunctive relief to keep his hair long, based on

15  the revision of CDCR's pertinent grooming regulation.  See Cal. Code Regs. tit. 15, § 3062(e)

16  ("An inmate's hair may be any length but shall not extend over the eyebrows, cover the inmate's

17  face or pose a health and safety risk. . . .").  The court denied plaintiff's claim that CDCR's prior

18  hair-length regulation violated his rights under the First Amendment Free Exercise Clause, based

19  on the Ninth Circuit's holding in Henderson v. Terhune, 379 F.3d 709, 712 (9th Cir. 2004)

20  (finding that CDCR's prior hair-length regulation was reasonably related to legitimate

21  penological interests).  The court also denied plaintiff's damages claim under the Religious Land

22  Use and Institutionalized Persons Act ("RLUIPA") on the ground that defendants were entitled to

23  qualified immunity prior to the Ninth Circuit's decision which clearly established plaintiff's

24  ――――――――――――

25      [1]  For the reasons set forth in this court's findings and recommendations filed January 28,
    2009 (Dkt. No. 49), adopted by order filed March 19, 2009 (Dkt. No. 51) and discussed herein,

26  the court addresses only plaintiff's contention that defendants retaliated against him for filing
    administrative grievances, not because plaintiff refused to cut his hair.

1  rights, in <u>Warsoldier v. Woodford</u>, 418 F.3d 989 (9th Cir. 2005) (finding that CDCR's prior hair-

2  length regulation violated RLUIPA).  In addition, the court dismissed plaintiff's state law claims

3  for failure to demonstrate compliance with the California Tort Claims Act claim presentation

4  requirements.  <u>See</u> Order filed March 19, 2009 (Dkt. No. 51), adopting Findings and

5  Recommendations filed January 28, 2009 (Dkt. No. 49).

6          Defendants now move for summary judgment on each of plaintiff's remaining

7  claims based on the substantive standards set forth in Federal Rule of Civil Procedure 56 or,

8  alternatively, qualified immunity.  For the reasons set forth below, this court recommends that

9  defendants' motion be denied in its entirety.

10  II.  <u>Legal Standards for Summary Judgment</u>

11          Summary judgment is appropriate when it is demonstrated that the standard set

12  forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should be rendered

13  if . . . there is no genuine issue as to any material fact, and . . . the movant is entitled to judgment

14  as a matter of law."  Fed. R. Civ. P. 56(c).

15          Under summary judgment practice, the moving party always bears the
            initial responsibility of informing the district court of the basis for its
16          motion, and identifying those portions of "the pleadings, depositions,
            answers to interrogatories, and admissions on file, together with the
17          affidavits, if any," which it believes demonstrate the absence of a genuine
            issue of material fact.

18

19  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c).  "[W]here the

20  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

21  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

22  to interrogatories, and admissions on file.'"  <u>Id</u>.  Indeed, summary judgment should be entered,

23  after adequate time for discovery and upon motion, against a party who fails to make a showing

24  sufficient to establish the existence of an element essential to that party's case, and on which that

25  party will bear the burden of proof at trial.  <u>See id</u>. at 322.  "[A] complete failure of proof

26  concerning an essential element of the nonmoving party's case necessarily renders all other facts

3

1    immaterial." Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

2    as whatever is before the district court demonstrates that the standard for entry of summary

3    judgment, as set forth in Rule 56(c), is satisfied." Id.

4         If the moving party meets its initial responsibility, the burden then shifts to the

5    opposing party to establish that a genuine issue as to any material fact actually exists. See

6    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

7    establish the existence of such a factual dispute, the opposing party may not rely upon the

8    allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

9    form of affidavits, and/or admissible discovery material, in support of its contention that the

10   dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

11   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

12   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

13   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

14   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

15   return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809

16   F.2d at 631.

17        In the endeavor to establish the existence of a factual dispute, the opposing party

18   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

19   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

20   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

21   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

22   genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) Advisory

23   Committee's note on 1963 amendments).

24        In resolving a summary judgment motion, the court examines the pleadings,

25   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

26   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. See Anderson,

4

1   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

2   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

3   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

4   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

5   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

6   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

7   show that there is some metaphysical doubt as to the material facts . . .  Where the record taken

8   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

9   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

10           On June 18, 2008, the court advised plaintiff of the requirements for opposing a

11  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 29.)  See Rand v.

12  Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999); and

13  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

14  III.  Legal Standards for Qualified Immunity

15           "Qualified immunity balances two important interests – the need to hold public

16  officials accountable when they exercise power irresponsibly and the need to shield officials from

17  harassment, distraction, and liability when they perform their duties reasonably."  Pearson v.

18  Callahan, 129 S.Ct. 808, 815 (2009).  The objective of the qualified immunity doctrine is to

19  ensure "that 'insubstantial claims' against government officials be resolved prior to discovery

20  and on summary judgment if possible."  Anderson v. Creighton, 483 U.S. 635, 640 n. 23 (1987),

21  citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982) . Meeting this objective requires that

22  immunity questions be resolved "at the earliest possible stage in litigation."  Hunter v. Bryant,

23  502 U.S. 224, 227 (1991) (per curiam).

24           "An official is entitled to summary judgment on the ground of qualified immunity

25  where his or her conduct does not violate clearly established statutory or constitutional rights of

26  which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

1   Until recently, courts considering an official claim of qualified immunity followed the two-step

2   protocol established in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), which required a court first to

3   determine whether the defendant violated a constitutional right and then to determine whether

4   that right was clearly established.  In <u>Pearson v. Callahan</u>, the Supreme Court reversed this earlier

5   rule and gave courts discretion to grant qualified immunity on the basis of the 'clearly

6   established' prong alone, without deciding in the first instance whether any right had been

7   violated.  <u>Id</u>.  Thus, a court may grant qualified immunity if "the facts that a plaintiff has alleged

8   or shown [do not] make out a violation of a constitutional right" or if "the right at issue was [not]

9   'clearly established' at the time of defendant's alleged misconduct.'"  <u>James v. Rowlands</u>, 606

10  F.3d 646, 650-51 (9th Cir. 2010), quoting <u>Pearson</u>, 129 S.Ct. at 816, 818 (internal citations

11  omitted).  Conversely, a motion based on qualified immunity will be denied if, construing the

12  facts in the light most favorable to the party asserting the injury, defendant violated a

13  constitutional right that was  clearly established at the time of the alleged injury.  <u>Saucier</u>, 533

14  U.S. at 201.

15  IV.  <u>Undisputed and Disputed Facts</u>

16          All facts, both disputed and undisputed, are set forth as pertinent to each of

17  plaintiff's claims and defendants' motion for summary judgment thereon.  Facts designated

18  undisputed were presented by defendants in their "Statement of Undisputed Facts" ("SUF") (Dkt.

19  No. 69), and were either expressly not disputed by plaintiff in his "Statement of Disputed Facts"

20  ("PDF") (Dkt. No. 75) or, following the court's review of the submitted evidence, are deemed

21  undisputed.

22          The parties agree on the following threshold facts.  At all times relevant to this

23  action, plaintiff was a prisoner in the custody of CDCR at HDSP in Susanville, California.  (SUF

24  1.)  Plaintiff began his most recent term of incarceration on December 14, 2000, following

25  revocation of his parole.  (SUF 6.)  Plaintiff was transferred to HDSP as a Level IV inmate on

26  June 25, 2003.  (SUF 7.)

V. <u>Analysis</u>

    A. <u>First Amendment Right to Religious Freedom/Retaliation</u>

        1. <u>Contentions</u>

        The Second Amended Complaint alleges that plaintiff was denied his First Amendment right to the free exercise of religion when, on March 21, 2004, defendant Amero ordered that plaintiff not be permitted to attend religious services.  (SAC, at 10).  Defendants contend that summary judgment should be granted on this issue because Amero's refusal to allow plaintiff to attend religious services was based on plaintiff's failure to sign up for services in accordance with established procedures.  Plaintiff contends that he did sign up for services and that he was denied attendance in retaliation for filing administrative grievances.  The court addresses plaintiff's claim as to both March 21, 2004, and May 2, 2004, because, as discussed herein, both appear to be administratively exhausted.  Amero is the only defendant against whom this claim is made.

        2. <u>Facts</u>

        The following facts are undisputed.  At all times relevant to this cause of action, plaintiff was housed in B-Facility and classified in Work Group "C"/Privilege Group "C."  Any inmate, including a Privilege Group "C" inmate, wishing to attend religious services must sign up to so attend.  (SUF 17, 18; <u>see</u> <u>also</u>, Def. Exh. A (Dkt. No. 69-2, at 12) (setting forth Cal. Code. Regs. tit. 15, § 3210 (establishment of religious programs), and § 3274 (inmate count and movement).)  A sign-up sheet is kept in each building, and every inmate has access to the sheet.  (SUF 19.)  At the end of the week, an inmate clerk collects the sign-up sheets for each housing unit and types a master roster with the names of those inmates who have signed up for services.  (SUF 20.)  The typed roster is given to the Sergeant, who reviews the roster and compares it to the sign-up sheet to make sure that every inmate who signed up is on the typed roster, and that inmates who did not sign up are not on the roster.  The Sergeant then signs off on the roster and copies are distributed to all facility officers.  (SUF 21.)  During the relevant period, defendant

1    Amero was the Correctional Sergeant who reviewed and signed off on the religious services

2    roster for B-Facility.  (SUF 3, 23.)

3             Inmates are required to sign up for services to maintain order and security within

4    the institution.  Use of sign-up sheets allows staff to track inmates' movements within the

5    facility, and provides for the orderly release and return of inmates to and from their housing.  If

6    an inmate fails to attend services and his name is on the list, staff can call the housing unit to

7    ensure that the inmate is not in an area where he should not be.  Knowing the exact movements

8    of inmates helps staff prevent the possibility of an undetected escape and assists officers in

9    deterring inmates involved in illegal activity by monitoring which inmates are scheduled to be on

10   the yard, inside their housing units, or in the program area where the chapel is located.  (SUF 22.)

11            Plaintiff filed two related administrative grievances alleging that defendant Amero

12   refused to allow him to attend religious services on March 21, 2004, and again on May 2, 2004.

13   (SUF 24; SAC, at 58-61, 89-91; Def. Exh. A-1, Dkt. No. 69-2, at 8-11; Pltf. Exhs at PDF, Dkt.

14   No. 75, at 8-16, 44-48, 60-62.)[2]  The first grievance was filed (or at least signed) on March 21,

15   2004.  (See, e.g., Dkt. No. 17, at 42, 55; Dkt. No. 75, at 60.)  The second grievance, filed May 2,

16   2004, alleged that plaintiff's denial of access to religious services  was "out of retaliation for

17   filing Appeal 602s."  (Dkt. No. 17, at 58; Dkt. No. 69-2, at 8.)  Interim grievances alleged, inter

18   alia, denial of access to religious services "for filing grievances" and include those grievances

19   filed April 8, 2004 (Dkt. No. 17, at 56, 72; Dkt. No. 75, at 50), and April 11, 2009 (Dkt. No. 75,

20   at 40).  Another grievance, filed on April 28, 2004, alleged that correctional officer Miranda (not

21   a defendant in this action) acted in retaliation by improperly posting one of plaintiff's

22   administrative grievances.  (Dkt. No. 75, at 34-35.)

23   _____

24       [2]  Copies of plaintiff's administrative grievances are attached to his filed documents in
     "shotgun" fashion with significant duplication.  This lack of organization, coupled with
25   defendants' apparent selectivity in their submission of documents, renders the court's citations
     less than thorough.  However, defendants have at no time asserted that plaintiff failed to exhaust
26   his administrative remedies on any of the claims now proceeding before this court.

The parties agree that plaintiff's grievances were partially granted at the first level response, which noted that inmates assigned to C/C status are allowed to attend religious services in compliance with regulatory requirements.  (SUF 26.)  Plaintiff elevated the grievance to the second level of review, claiming his original grievance had not been returned.  (SUF 27.) Plaintiff submitted the grievance to the Director's level of review on August 9, 2004, claiming that inmate Hogan had placed plaintiff's name on the religious services sign-up sheet, but still plaintiff was denied release to attend services.  (SUF 29.)  Plaintiff's appeal was denied at the Director's level, with a finding that on each of the occasions when plaintiff was refused release to the chapel, his name was not on the religious services sign-up lists.  (SUF 30.)

The parties dispute the following facts.  Defendants contend that plaintiff admitted to Sergeant Brewer, when he interviewed plaintiff relative to these grievances, that he had merely assumed that staff had intentionally refused to allow him to attend religious services.  (SUF 25, citing Def. Exh. A (Dkt. No. 69-2, at 10) (Second Level Review, finding "Sergeant Brewer asked you about staff intentionally not letting you go to service. . . . you stated that you assumed that it was intentional due to the fact that you were not allowed to go [and] requested that this matter be investigated").)  Plaintiff contends that he "never admitted that he assumed staff had intentionally refused to allow him to attend religious services.  Staff refused to allow him to attend religious services because of his 602 Appeals."  (PDF 25, citing Pltf. Exh. A (administrative appeals) (Dkt. No. 75, at 8-17); Exh. D (plaintiff's declaration in which he states in pertinent part that he was retaliated against for filing administrative grievances) (Dkt. No. 75, at 56)); and Exh. E (administrative appeals) (Dkt. No. 75, at 59-73)).

The parties also dispute whether the absence of plaintiff's name from the religious services sign-up sheets may have been attributable to clerical error.  Defendants contend that plaintiff's May 2004 administrative appeal against Sergeant Amero "was partially granted, but the second level response noted that Nelson's name was not on the list of inmates to be released for services on either March 21, 2004 or May 2, 2004, and that this could have been due to a

1  clerical error.  DX A-1, p. 12."  (SUD 28, citing Def. Exh. A (Dkt. No. 69-2, at 13 (Second Level

2  Review, finding that plaintiff was denied access to religious services "due to his failure to sign up

3  for religious services, or due to a clerical error in not placing his name on the list of inmate's

4  (sic) to be released to the religious services")).)  Plaintiff contends that "[t]here was not any

5  clerical error, Nelson had Jason Hogan sign his name to the attendance service sheet on March

6  21, 2004 and May 2, 2004."  (PDF No. 28, citing Pltf. Exh. D (plaintiff's declaration in which he

7  states in pertinent part that he was retaliated against for filing administrative grievances) (Dkt.

8  No. 75, at p. 56, ¶ 7).)

9          In support of his factual allegations, plaintiff has submitted the declaration of

10  inmate Jason Hogan, who states in pertinent part that he was plaintiff's cellmate on March 21,

11  2004, and May 2, 2004; that "I personally signed Raymond Paul Nelsons' name to the religious

12  service attendance sheet on March 21, 2004 and May 2, 2004 as I had done every Sunday (sic);"

13  and that "Sergeant Amero refused to allow Raymond Paul Nelson access to religious services in

14  retaliation for filing 602 Appeals."  (Hogan Decl., Dkt. No. 75, at 6.)  While Hogan's second

15  assertion does not appear to be based on personal knowledge or meet the other requirements of

16  Federal Rule of Civil Procedure 56(e) ("[a] supporting or opposing affidavit must be made on

17  personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

18  is competent to testify on the matters stated"), Hogan's first statement meets these requirements.

19          Defendant Amero responds in his own declaration as follows:

20      In May 2004, Inmate Nelson claimed that I refused to allow him to attend
        religious services because he filed grievances.  These allegations are false.
21      Inmate Nelson's claims were reviewed and it was found that he failed to
        sign up for religious services on either March 21, 2004 or May 2, 2004.
22
        I did not retaliate against inmate Nelson, and the refusal to release Nelson
23      to religious services was not based on either his privilege status or the fact
        that he filed grievances.  Inmate Nelson was refused release because he
24      failed to comply with proper procedures and sign up for religious
        services...
25

26  (Amero Decl., Dkt. No. 69-4, at p. 4, ¶¶ 19, 20.)

10

3. <u>Legal Standards</u>

"The right to exercise religious practices and beliefs does not terminate at the prison door.  The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."  <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citations omitted).  "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974); <u>see also</u>, <u>Clement v. Cal. Dep't. of Corr.</u>, 364 F.3d 1148, 1151 (9th Cir. 2004) (per curiam).  A prison regulation that impinges on First Amendment rights "is valid if it is reasonably related to legitimate penological interests."  <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987); <u>see also</u>, <u>Beard v. Banks</u>, 548 U.S. 521, 528 (2006).

Allegations of retaliation against a prisoner's exercise of his First Amendment rights may support a section 1983 claim.  <u>Rizzo v. Dawson</u>, 778 F.2d 527, 532 (9th Cir. 1985); <u>see also</u> <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135 (9th Cir. 1989); <u>Pratt v. Rowland</u>, 65 F.3d 802, 807 (9th Cir. 1995).  An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support claim under section 1983.  <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1288 (9th Cir. 2003).  "[A] viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 568 (9th Cir. 2005).  Direct and tangible harm will support a First Amendment retaliation claim even without demonstration of a chilling effect on the further exercise of a prisoner's First Amendment rights.  <u>Id</u>. at 568 n. 11.  "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a retaliatory adverse action.  <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009), citing <u>Rhodes</u>, 408 F.3d at 568 n. 11.

4. <u>Analysis</u>

Plaintiff does not challenge the content of the regulations controlling the attendance of HDSP prisoners at religious services, but rather alleges that defendant Amero, acting in retaliation against plaintiff, failed to abide by those regulations.  Hence, contrary to defendants' briefing, this case does not present the question whether the subject regulations are reasonably related to legitimate penological interests, which plaintiff concedes.  <u>See</u> <u>Turner v. Safley</u>, supra, 482 U.S. at 89-90 (setting forth factors to be considered in determining the constitutionality of a challenged prison regulation).

Rather, at the heart of this matter are the parties' conflicting assertions of material facts as to the reason(s) plaintiff was denied attendance at religious services on March 21, 2004, and May 2, 2004.  Plaintiff claims that his name was on the sign-up sheets, defendants contend that it was not.  The subject sign-up lists are not part of the record.  Thus, the court is unable to ascertain the truth of either party's position and may not, on summary judgment, assess their credibility or draw inferences based on the available evidence.  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631; <u>see also</u> <u>Nelson v. City of Davis</u>, 571 F.3d 924, 927 (9th Cir. 2009) ("credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge") (citations omitted).  This unresolved question is material to both of plaintiff's First Amendment claims, thus precluding entry of summary judgment on the substance of those claims.

5. <u>Qualified Immunity</u>

Defendants concede that during the relevant period plaintiff had a clearly established First Amendment right to attend religious services, subject to reasonable regulation. (Dkt. No. 69, at 11-13.)  They argue that defendant Amero is nonetheless entitled to qualified immunity because "[t]he undisputed evidence establishes that Sergeant Amero refused to allow Nelson to attend religious services because Nelson failed to sign up for those services."  (<u>Id</u>. at 12.)  However, as discussed above, there are material factual disputes concerning this matter.

12

1  Under a qualified immunity analysis, the court is required to construe the facts in the light most

2  favorable to plaintiff.  Saucier, 533 U.S. at 201.  So construed, the court must assume that

3  plaintiff did in fact sign up for the subject services, which defendant Amero failed to honor.  This

4  construction would demonstrate a possible violation of plaintiff's clearly established

5  constitutional right to the free exercise of his religion and establish the premise for plaintiff's

6  further argument that he was denied such access only in retaliation for filing administrative

7  grievances.  Such construction precludes a finding that defendant did not knowingly violate

8  plaintiff's clearly established First Amendment rights and therefore precludes summary judgment

9  on defendant's qualified immunity defense.

10         6.  Conclusion

11         Genuine issues of material fact remain relative to plaintiff's First Amendment

12  claims that defendant Amero improperly denied plaintiff his right to the free exercise of  religion

13  in compliance with applicable regulations, and did so in retaliation for plaintiff filing

14  administrative grievances.  These issues preclude a ruling on the substance of plaintiff's claims

15  and rejection of defendants' alternate argument that defendant Amero is entitled to qualified

16  immunity.  Accordingly, defendants' motion for summary judgment on these First Amendment

17  claims should be denied.

18         B.  Eighth Amendment Deliberate Indifference to Plaintiff's Safety and Alleged

19         Retaliation

20         1.  Contentions

21         The Second Amended Complaint alleges that defendants Amero, Dangler and

22  Smith, acting in retaliation against plaintiff for filing administrative grievances, were deliberately

23  indifferent to plaintiff's safety, in violation of the Eighth Amendment, by facilitating plaintiff's

24  transfer from B-Facility to D-Facility on August 31, 2004, and then from "Upper D yard" to

25  "Lower D yard" on July 19, 2005, where plaintiff was assaulted by other inmates on August 9,

26  2005.  (SAC, Dkt. No. 17, at 8-9, 11-12, Exh. D, E, G, H.)  Defendants contend that summary

13

judgment should be granted on this issue because neither Dangler nor Smith had reason to

believe that such transfer might subject plaintiff to an unreasonable risk of harm.[3]

      2. <u>Facts</u>

      The following facts are undisputed.  At all times relevant to this action, defendant

Dangler was employed by CDCR at HDSP as a Correctional Counselor I, and defendant Smith

was so employed as a Correctional Sergeant.  (SUF 2, 4.)  Defendant Amero was employed as a

Correctional Sergeant.  (SUF 3.)  On August 31, 2004, plaintiff was moved from B-Facility to D-

Facility.  (SUF 31.)  Both facilities are "Level IV" yards, and no classification committee hearing

is required to move an inmate from B-Facility to D-Facility.  (SUF 32, citing Def. Exh. C (March

14, 1996 Memorandum entitled "Level IV Transfers to 180 Design Facilities).)  Plaintiff was

assaulted by inmates Sewards and White on August 9, 2005.  (SUF 34.)

      The parties dispute the known risk to plaintiff pursuant to his transfer to D-

Facility.  Defendants contend that plaintiff "had no documented enemies on D-Facility prior to

his transfer," and did not complain about "being on D-Facility" or tell "staff that he feared for his

safety" before he was assaulted.  (SUF 33, 34.)  Plaintiff, who is Caucasian, contends that "[i]t

was common knowledge that white B yard inmates were not allowed on D yard because of prison

yard war politics.  [Plaintiff] told staff that he would be severely beaten and feared for his life if

he were to be placed on D yard days before the attack, when he was moved to upper level D yard.

[Plaintiff] was told by Dangler[,] Amero, and Smith that he was going to be dealt with for filing

602s and this would be accomplished by placing him in D yard."  (PDF 33, 34.)

      Plaintiff has filed an affidavit wherein he states, under penalty of perjury, in

pertinent part:

> While in the classification committee hearing on Nov 4, 2004, Defendant
> Dangler told me that he was going to put me on C or D yard if I didn't cut
> my hair.  Capt. Briddle ordered Dangler not to move me to C or D yard

---

[3]  Defendants state incorrectly that plaintiff makes this claim only against defendants
Dangler and Smith.  Plaintiff also makes this claim against defendant Amero.

because it was common knowledge among inmates and staff that an inmate from B yard that was placed on C or D yard would get brutally beaten, stabbed or killed.  (Id. at ¶ 6.)

From Nov 4, 2004 I was continuously threatened by Correctional Officers to be moved to C or D yard out of retaliation for filing Inmate/Parollee Appeal Form 602.  I filed the 602's for being denied unlocks for my C status programming such as yards, showers, and religious services.  (Id. at ¶ 7.)

On August 31, 2004 I was ordered by CO Crane to pack up because I was being moved to upper D yard.  I informed him I couldn't be moved to D or C yard because my life would be in danger.  And he told me I was an add-on to the list and that I would be safe because they moved all the upper D yard inmates off that yard and only B yard inmates would be on that yard.  So I moved from B4 107 to D6 112.  He was correct because there were no D yard inmates on upper D yard and I was safe. (Id. at ¶ 8.)

On July 19, 2005 CO Smith came to my cell D6 112 and said to pack up because we were being moved to lower D yard; D1 205.  My cellie Christiansen[4] [] and I informed CO Smith that we couldn't be moved to C or Lower D yard because we were from B yard and we would be stabbed, brutally beaten or killed.  This was in direct retaliation for filing 602s because Dangler, Amero, and Smith told me that I kept filing the 602s that I was going to be dealt with and moved to lower D yard.  (Id. at ¶ 9.)

We packed up and asked to the see the Sgt.  I was taken to the D yard programming office for refusing to move.  I talked to Sgt. A. Smith and two other Sgts. and explained that B yard whites were being stabbed and brutally beaten because of yard war politics.  They refused my request.  I told them to call the warden and they told me no that "he was at home in his bedroom slippers having a toddy and wouldn't come in just for our bullshit."  (Id. at ¶ 10.)

On August 9, 2005 my cellie Christiansen at approximately 1015 hours was placed on lower D exercise yard and was attacked.  He had previously filed 602s for being placed in AG SEG (sic).[5]  (Id. at ¶ 11.)

On August 9, 2005 at approximately 1040 hours after the yard had been cleared from the attack on Christiansen [t]he CO came to my cell and told me, "I guess you know what time it is, your cellie now knows what time it is" and was released from my cell onto D yard against my will and was attacked by inmates Seward and White.  (Id. at ¶ 12.)

---

[4]  Plaintiff interchangeably spells the name of his cellmate as "Christiansen" and "Christianson;" the court relies on the first spelling throughout this order.

[5]  Plaintiff refers to administrative segregation, commonly abbreviated "Ad Seg," as "AG SEG."

1  (Pltf. Exh. D, Dkt. No. 75, at 54-58.)

2         It appears that, following plaintiff's assault, he was transferred to B-Facility on

3  August 18, 2005, and has remained in B-Facility or A-Facility until the present time, with the

4  limited exceptions of a few hours in C-Facility in September 2005, and a month-a-half in the D-

5  Facility gym in 2007.  (Dkt. No. 69, Def. Exh. D.)

6         3.  Legal Standard

7         The Eighth Amendment prohibits the imposition of cruel and unusual

8  punishments and "embodies broad and idealistic concepts of dignity, civilized standards,

9  humanity and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976) (citation and internal

10  quotations omitted).  "Prison officials have a duty to take reasonable steps to protect inmates

11  from physical abuse."  Hoptowit v. Ray, 682 F.2d 1237, 1250 (9th Cir. 1982); see also, Hearns v.

12  Terhune, 413 F.3d 1036,1040 (9th Cir. 2005).  More specifically here, "prison officials have a

13  duty . . . to protect prisoners from violence at the hands of other prisoners."  Farmer v. Brennan,

14  511 U.S. 825, 833 (1994) (citation and internal quotations omitted); see also, Robinson v. Prunty,

15  249 F.3d 862, 866 (9th Cir. 2001) (Eighth Amendment claim stated where prisoner, an African-

16  American, was attacked by Mexican-American prisoners in integrated exercise yard where

17  frequent racial attacks occurred).

18         "[A] prison official violates the Eighth Amendment when two requirements are

19  met.  First, the deprivation alleged must be, objectively, 'sufficiently serious'. . . .  For a claim

20  (like the one here) based on a failure to prevent harm, the inmate must show that he is

21  incarcerated under conditions posing a substantial risk of serious harm."  Farmer v. Brennan, 511

22  U.S. at 834.  Second, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official

23  must have a 'sufficiently culpable state of mind' . . . [T]hat state of mind is one of 'deliberate

24  indifference' to inmate health or safety."  Id.  The prison official will be liable only if "the

25  official knows of and disregards an excessive risk to inmate health and safety; the officials must

26  both be aware of facts from which the inference could be drawn that a substantial risk of serious

1  harm exists, and he must also draw the inference." Id. at 837.  To prove knowledge of the risk,

2  the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be

3  sufficient to establish knowledge.  Id. at 842.  Prison officials may not escape liability because

4  they cannot, or did not, identify the specific source of the risk; the serious threat can be one to

5  which all prisoners are exposed.  Id. at 843.  Prison officials may, however, avoid liability by

6  presenting evidence that they lacked knowledge of the risk.  Id. at 844.  Moreover, prison

7  officials may avoid liability by presenting evidence of a reasonable, albeit unsuccessful, response

8  to the risk.  Id. at 844-45.

9         In addition, pursuant to plaintiff's claims that defendants intentionally placed him

10  at risk in retaliation for filing administrative grievances, the law recognizes that direct and

11  tangible harm will support a First Amendment retaliation claim.  Rhodes v. Robinson, 408 F.3d

12  at 568 n. 11; Brodheim v. Cry, 584 F.3d at 1269.

13         4. Analysis

14         Defendants' evidence is substantially deficient.  Significantly, neither defendant

15  Dangler nor Smith have filed an affidavit, and defendant Amero's affidavit does not address

16  these matters.  In support of defendants' proffered undisputed fact that plaintiff "had no

17  documented enemies on D-Facility prior to his transfer" (SUF 33), defendants reference an

18  exhibit that indicates only that, as of the date of the assault, neither Sewards and White had

19  known enemies. ( Def. Exh. A-1, Dkt. No. 69-2, at pp 17-21.)  Moreover, defendants' proffered

20  undisputed fact that "Nelson had not previously complained about being on D-Facility or told

21  staff that he feared for his safety" (SUF 34) contradicts evidence of record.  Plaintiff allegedly

22  previously voiced these concerns to officials when he filed what he now characterizes as an

23  "Emergency Appeal" (administrative grievance) on April 11, 2004, wherein he sought

24  reinstatement of C-Status rights within B-Facility "without transfer to Ward C-D yards in

25  retaliation from prison guard[]s and no disciplinary segregation for filing grievances." (SAC,

26  Exh. D, Dkt. No. 17 at 50.)  Plaintiff explained (sic):

> High Desert State Prison white inmates from B-yard can not go to
> other yard's because of yard war's . . . execution by slit throats and
> stuck with knifes, by other yard-whites.  Petitioner's in this case is
> in fear for his life because of danger of transfer in retaliation to
> other yard's.  Placement in disciplinary segregation in retaliation
> for filing grievance will put my life in danger of ambush and
> murder. . .

(Id.; see also, id. at 57.)

Correctional staff acknowledged plaintiff's concerns in at least one response.

(See, e.g., First Level Appeal Response dated May 28, 2004 (Dkt. No. 17, at 79 ("Your request

not to receive retaliatory action against you or be placed in danger is granted . . . , employees

shall not retaliate against inmates for filing appeals or any other reason."); see also Dkt. No. 75,

at 53.)  While the complaint contains other references to these matters,[6] and plaintiff allegedly

sought further relief from officials after his assault (see, e.g., Dkt. No. 75, at 35-36

(administrative appeal commenced September 16, 2005, alleging in part that "my request for no

reprisals for using the 602 appeal procedure was violated" and "HDSP correctional officer did

wilfully and deliberate[ly] put me and Christensen lifes in danger that cause injury on lower D-

yard, they try to send me and Christensen [] to C-yard out of retaliation to be injured (sic) . . .

.")), the most significant aspect of the record is the failure of defendants to submit any affidavits

or other evidence rebutting plaintiff's factual allegations that defendants knew plaintiff's transfer

to D-Facility would present a substantial risk of serious harm to him, and made the transfer with

that intent and in retaliation for plaintiff filing administrative grievances.

Thus, defendants have failed to demonstrate the absence of dispute on material

---

[6] Although plaintiff's complaint contains at least two additional exhibits detailing
plaintiff's alleged fears associated with being transferred to D or C yard (see SAC, Dkt. No. 17,
at 106, 108-12), neither appear adequate.  The first exhibit (list of assaults in lower and upper D
yards) does not appear to be based on plaintiff's personal knowledge, and the second (rendition
of material facts) is undated and unsigned (but see Ex. B to Plaintiff's Statement of Disputed
Facts, Dkt. No. 75, at 17-31 (which may be the full document, signed under penalty of perjury
and dated October 3, 2005)).  Thus, neither document, at least as presented in plaintiff's Second
Amended Complaint, may properly be considered a sworn affidavit.  See Schroeder v.
McDonald, 55 F.3d 454 (9th Cir. 1995) (a verified complaint based on personal knowledge
setting forth specific facts admissible in evidence is treated as an affidavit).

1  facts as to these Eighth and First Amendment claims.  Plaintiff, on the other hand, has submitted

2  an affidavit under penalty of perjury, with some corroborating documentation, that appear to

3  support his claims that defendants purposefully placed plaintiff at risk, possibly in retaliation for

4  filing administrative grievances, and that he was injured as a result.  Given these factual disputes,

5  summary judgment on the substance of plaintiff's claims is inappropriate.

6         5.  <u>Qualified Immunity</u>

7        Defendants seek, alternatively, qualified immunity on this claim.  While they

8  concede that "[d]efendants had a clearly established duty to assure Nelson's safety," citing

9  <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984), they argue that "[n]o evidence shows, however,

10  that any Defendant breached that duty."  (Dkt. No. 69, at 12.)  They again assert that "Nelson

11  had no documented enemies on D-Facility, and there was no evidence that White inmates were

12  subject to assault if moved to D-Facility."  (<u>Id</u>. at 13.)  However, the court has found that there

13  remain material factual disputes whether defendants Smith, Dangler and/or Amero knew, or

14  reasonably should have known, that plaintiff's transfer to D-Facility, and his further transfer from

15  "upper D yard" to "lower D yard," would expose plaintiff to an excessive risk of harm.

16  Construing the facts in the light most favorable to plaintiff, <u>Saucier</u>, 533 U.S. at 201, the court

17  must conclude that defendants acted with deliberate indifference to plaintiff's clearly established

18  Eighth Amendment right to be protected from a substantial risk of serious harm.  This

19  construction is inconsistent with defendants' qualified immunity defense.  "If an officer

20  recklessly disregards an inmate's need for safety he certainly cannot maintain an objective good

21  faith immunity defense.  By the same token, if a prison official fails the objective good faith

22  immunity test – i.e., he is aware of an inmate's need for protection but fails to take adequate

23  safeguards to protect him – then he has exhibited the sort of 'reckless indifference' sufficient to

24  constitute 'cruel and unusual punishment.'"  <u>Miller v. Solem</u>, 728 F.2d 1020, 1025 (8th Cir.

25  1984) (citations omitted); <u>see also</u> <u>Albers v. Whitley</u>, 743 F.2d 1372, 1376 (9th Cir. 1984)

26  (deliberate indifference and qualified immunity are "mutually exclusive"), <u>rev'd</u> <u>on</u> <u>other</u>

1   grounds, 475 U.S. 312 (1986).  Thus, defendants' summary judgment motion based on a

2   qualified immunity defense to these claims must be denied.

3          6.  Conclusion

4          Genuine issues of material fact remain relative to plaintiff's Eighth Amendment

5   claim that defendants were deliberately indifferent to plaintiff's safety when they transferred him

6   to D-Facility, particularly to "lower D yard," and his First Amendment claim that defendants'

7   conduct was motivated by retaliation in response to plaintiff filing administrative grievances.

8   These issues preclude a ruling on the substance of plaintiff's claims as well as summary

9   judgment on defendants' qualified immunity defense.  Accordingly, defendants' motion for

10  summary judgment on these claims should be denied.

11      C.  Eighth Amendment Claim of Deliberate Indifference to Plaintiff's Medical Needs

12          1.  Contentions

13          In his Second Amended Complaint, plaintiff alleges deliberate indifference to his

14  medical needs by defendants Garbutt, a nurse, and James, a physician, following the assault

15  against plaintiff on August 9, 2005.  Plaintiff alleges that Nurse Garbutt failed to provide proper

16  medical care or immediately refer plaintiff to a physican "for physical evaluation x-rays to treat

17  broken nose, possible cracked cheekbone and blurred vision. . ." (SAC, at 13.)  Plaintiff further

18  alleges that he "was scheduled for follow-up but the visit never took place and [he] had to file a

19  medical request for a visit with medical Doctor James and was refused treatment." (Id.)  Plaintiff

20  alleges that Dr. James failed to accord plaintiff "adequate medical care, x-rays, etc. and

21  evaluation of physical diagnosis . . . failed to respond appropriately and did not respond at all to

22  my serious medical needs . . . [which were] very obvious." (Id.)  Plaintiff contends that these

23  defendants' failure to provide him adequate medical care constituted deliberate indifference to

24  plaintiff's serious medical needs in violation of the Eighth Amendment.

25          2.  Facts

26          Plaintiff, who is no longer incarcerated, obtained an x-ray of his nose on February

23, 2010.  The radiological report, also dated February 23, 2010, concluded that plaintiff has a "deformity of the nasal bone" based on the following findings:  "The tip of the nose is deviated to the right and the base of the septum appears deviated to the left.  The bridge of the nose appears deformed near the tip with apex superior angulation.  This may be from an old fracture."  (Pltf. Exh. F, Dkt. No. 75, at 75.)  Defendants did not file a reply and their briefing does not address this information.  The court finds that the information set forth in this radiological report is undisputed.

The following facts are also undisputed.  Following the assault, plaintiff was escorted to the D-Facility medical clinic for treatment.  The admitting nurse noted that plaintiff had a cut on his nose, and active bleeding.  (SUF  35.)  Plaintiff was escorted to the Correctional Treatment Center ("CTC") emergency room for additional treatment.  There Nurse Garbutt examined Nelson and noted that his pulse, temperature, and blood pressure were within normal limits, his skin color was normal, but slightly flushed, his lung sounds were clear, and his breathing unlabored.  Plaintiff was given a diptheria/tetanus shot and tylenol.  Nurse Garbutt opined that plaintiff had "no major injuries," but told plaintiff to follow up with the yard doctor.  (SUF 36.)

On August 19, 2005, plaintiff submitted a sick-call slip asking for an appointment to see a doctor.  (SUF 37.)  The nurse who reviewed the slip noted that the appointment was routine, but that plaintiff should be seen that week.  (SUF 38.)  Plaintiff was seen by Nurse Roach on August 21, 2005.  She noted that Nelson's nose was reddish-black in color, deviated to the left, and that he was unable to breath through the right nostril.  (SUF 39.)

On August 27, 2004, plaintiff submitted a second sick call slip.  Plaintiff alleges that he went to see the doctor, but the yard was called down, and he was returned to his cell and not called back for his appointment.  The call slip was completed by Nurse Roach, who scheduled an appointment for September 2, 2005.  (SUF 40.)

Plaintiff was examined by Dr. James on September 2, 2005, who noted that

plaintiff's nose was swollen and deviated, but the color was good and plaintiff's breathing was

"okay." Dr. James noted that plaintiff had mild tenderness over the right cheekbone, but his

facial movements were normal, and plaintiff could bite down hard.  Dr. James did not believe

that plaintiff had a fracture as there was no ecchymosis over the cheek.  Dr. James prescribed 400

milligrams ibuprofen four times a day for ninety days.  (SUF 41.)  At all times relevant to this

action, Dr. James was employed by CDCR at HDSP as a Physician and Surgeon.  (SUF 5.)

Plaintiff was not treated again until May 30, 2006, when Dr. James referred

plaintiff for an optometry consultation.  (SUF 42.)  Plaintiff was seen by the optometrist on

September 5, 2006, who found that plaintiff's vision was normal, but deteriorating with age.  The

optometrist recommended reading glasses.  (SUF 43.)

Plaintiff contends that the following matters are disputed.  Plaintiff alleges that,

contrary to Nurse Garbutt's assessment, he "did suffer major injuries specifically a broken nose."

(PDF 36, citing Pltf. Exh. F.)  Plaintiff also alleges that, contrary to Nurse Roach's assessment

that plaintiff was in "no acute distress," plaintiff "was in distress because his nose was broken."

(PDF 39.)  Finally, plaintiff alleges that he "continuously asked that Dr. James give him an x-ray

to properly treat the injuries he sustained in the August 9, 2005 attack."  (PDF 41, citing Def.

Exh. D, at p. 4.)

Plaintiff's Exhibit D is his declaration signed under penalty of perjury wherein he

states in pertinent part the following:

> In the attack I received a broken nose, eye and head injuries.  (Id. at ¶ 13.)

> I was taken to the D yard clinic and the nurse told me that my nose was
> broken and she was sending me to the emergency room for treatment.  (Id.
> at ¶ 14.)

> The emergency room nurse told me that I had no major injuries but I
> complained that I knew that my nose was broken and asked to be x-rayed.
> The nurse ignored my request and sent me back to the program office
> where I was put in AGSEG.  (Id. at ¶ 15.)

> On August 19, 2005 I submitted a sick call slip to see a Dr. because I was
> in severe pain, could not breath and the pain was intolerable.  They refused

1    to let me see a Dr.  (Id. at ¶ 16.)

2    On August 21,2005 I was finally taken to the clinic after repeatedly complaining that I couldn't breathe because my nose was broken.  The

3    nurse noted that my nose was reddish black in color and deviated to the left and that I was unable to breathe through the right nostril.  I was then

4    sent back to AGSEG.  (Id. at ¶ 17.)

5    On August 22 [2005], I submitted a sick call slip for nose pain, in route to the clinic there was a fight on the yard and it was called down so I was

6    returned to my cell without receiving any treatment.  I was never escorted back to the clinic for my appointment even though I personally witnessed

7    other inmates who had scheduled appointments that day escorted back to the clinic for their appointments.  (Id. at ¶ 18.)

8

9    On September 2, 2005 I was finally examined by Dr. James.  I told Dr. James that my nose was broken and he told me "it was not a life or death injury" and denied my request for x-rays.  I was returned to my cell with a

10    broken nose and some ibuprofen.  (Id. at ¶ 19.)

11    I was seen by Dr. James once more on May 30, 2006.  I informed him my nose was still broken and I was having trouble seeing.  He referred me to

12    the eye Dr. (Id. at ¶ 20.)

13    (Pltf. Exh. D, Dkt. No. 75, at 55-58.)

14        While defendants have submitted plaintiff's pertinent medical records (Dkt. No.

15    69-4, at 17-30), they have not submitted any affidavits from defendants James or Garbutt or any

16    other medical professional.

17        3.  Legal Standard

18        In order to demonstrate violation of the Eighth Amendment based on inadequate

19    medical care, plaintiff must prove "acts or omissions sufficiently harmful to evidence deliberate

20    indifference to serious medical needs."  Estelle v. Gamble, supra, 429 U.S. at 106.  A serious

21    medical need exists if the failure to obtain appropriate treatment could result in further significant

22    injury or the unnecessary and wanton infliction of pain.  A serious medical need includes an

23    injury that a reasonable doctor or patient would find important and worthy of comment or

24    treatment, a medical condition that significantly affects an individual's daily activities, or chronic

25    and substantial pain.  See Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing

26    cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989); McGuckin v. Smith, 974

1   F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller,

2   104 F.3d 1133 (9th Cir. 1997) (en banc).

3           The dispositive question is not identification of the most appropriate course of

4   treatment, but whether the chosen course was, in essence, criminally reckless.  In Farmer v.

5   Brennan, supra, 511 U.S. 825, the Supreme Court set a very strict standard which a plaintiff must

6   meet in order to establish "deliberate indifference."  Negligence is insufficient.  Id. at 835.  Civil

7   recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious

8   that it should be known) is insufficient.  Id. at 836-37, 842.  Rather, the official must both

9   reasonably infer that there exists a substantial risk of serious harm and consciously disregard that

10   risk "by failing to take reasonable measures to abate it."  Id. at 837, 847.  "[I]t is enough that the

11   official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at

12   842.

13           Deliberate indifference does not require that a physician altogether fail to treat an

14   inmate.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  Even if some treatment

15   is prescribed, a failure to competently treat a serious medical condition may constitute deliberate

16   indifference in a particular case.  Id.  Additionally, mere delay in medical treatment without more

17   is insufficient to state a claim of deliberate indifference.  Shapley v. Nevada Bd. of State Prison

18   Com'rs, 766 F.2d 404, 407 (9th Cir. 1985).  Rather, "the more serious the medical needs of the

19   prisoner, and the more unwarranted the defendant's actions in light of those needs, the more

20   likely it is that a plaintiff has established deliberate indifference on the part of the defendant."

21   McGuckin, 974 F.2d at 1061.

22           Mere differences of opinion concerning appropriate treatment cannot be the basis

23   of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

24   Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Nonetheless, in cases involving

25   complex medical issues, expert opinion will almost always be necessary to establish both the

26   standard of care and the contours of deliberate indifference.  Hutchinson v. United States, 838

1  F.2d 390 (9th Cir. 1988).  However, unless plaintiff can demonstrate a material issue of fact by

2  providing expert evidence that the treatment he received may have been deliberately indifferent,

3  summary judgment should be entered for defendants.

4          4.  Analysis

5          There is no evidence that plaintiff suffered a serious injury to his nose prior to the

6  2005 assault.  Thus, the 2010 x-ray demonstrates that the injury plaintiff sustained in the assault

7  was "serious."  Plaintiff alleges that the injury caused him substantial pain, which is supported by

8  his prescriptions for tylenol and ibuprofen, and the x-ray demonstrates permanent disfigurement.

9  Significantly, defendants have not submitted any evidence or statement to refute plaintiff's

10  supported allegations that his nose was broken in the assault and that defendants did not respond

11  appropriately.  Plaintiff's 2010 x-ray thus raises a material issue of fact whether defendants were

12  deliberately indifferent in failing to x-ray plaintiff's nose and treat the injury differently.  The

13  court cannot make this determination on the present record.  Additionally, while the scope of

14  defendant James' medical authority may reasonably be assumed, the extent of discretion

15  accorded Garbutt to order an x-ray or expedite referral to a physician remains unclear on the

16  present record.  For these reasons, the court recommends denying defendants' motion for

17  summary judgment on the substance of plaintiff's Eighth Amendment claim alleging deliberate

18  indifference to his serious medical needs.

19          5.  Qualified Immunity

20          Defendants contend, alternatively, that they are entitled to qualified immunity on

21  this claim because "Dr. James treated Nelson appropriately and, in any event, Nelson suffered no

22  adverse consequences from the care he was given."  (Dkt. No. 69, at 13.)  As in their other

23  qualified immunity arguments, defendants concede that plaintiff's claim rests on a well-

24  established constitutional right, here plaintiff's Eighth Amendment right to obtain medical care

25  that is not deliberately indifferent to his serious medical needs.  Estelle v. Gamble, supra, 429

26  U.S. 97; Farmer v. Brennan, supra, 511 U.S. 825.  However, as set forth above, there remain

material factual disputes regarding the seriousness of plaintiff's injuries and the extent to which

defendants knew of and disregarded an excessive risk of harm to plaintiff's health.  Construing

the facts in the light most favorable to plaintiff, Saucier, 533 U.S. at 201, the court must assume

that plaintiff's nose was broken in the 2005 assault, and that defendants consciously chose to

disregard, further diagnose and/or treat this injury despite a substantial risk of further or

permanent harm to plaintiff.  So construed, plaintiff's allegations preclude summary judgment on

defendants' qualified immunity defense.  See Marcotte v. Monroe Corrections Complex, 394 F.

Supp. 2d 1289, 1299 (W.D. Wash. 2005) (assuming the truth of plaintiff's allegations, no

reasonable medical provider could have concluded that his medical care was constitutionally

permissible); see also Jackson v. McIntosh, supra, 90 F.3d at 332 ("Given the district court's

determination that there is a triable issue as to deliberate indifference, the doctors were not

entitled to summary judgment on the ground that they could reasonably have believed their

conduct did not violate clearly established law"), cert. denied, 1519 U.S. 1029 (1996); Lavender

v. Lampert, 242 F. Supp. 2d 821, 845 (D. Or. 2002) ("Because defendants, as the moving party,

have not met their initial burden to demonstrate that there is an absence of a genuine issue of

material fact with respect to the reasonableness of each defendant's conduct towards plaintiff's

allegations of deliberate indifference to his chronic pain, summary judgment on the basis of

qualified immunity is inappropriate with respect to plaintiff's Eighth Amendment claim on this

issue."); Cano v. Naku, 2010 WL 235066, *13 (E.D. Cal. 2010) ("Except in unusual medical

circumstances, an issue of fact regarding deliberate indifference will not permit a finding of

qualified immunity . . .  The finding of an issue of fact regarding deliberate indifference is

conclusively antagonistic to the qualified immunity defense on summary judgment."), adopted in

pertinent part, Cano v. Naku, 2010 WL 1173061, *1 (E.D. Cal. 2010).

         For these reasons, defendants' motion for summary judgment based on their

qualified immunity defense should be denied.

////

6.  <u>Conclusion</u>

There remain genuine issues of material fact relative to plaintiff's Eighth Amendment claim that defendants Garbutt and James were deliberately indifferent to plaintiff's serious medical needs resulting from his August 2005 assault.  These issues preclude a ruling on the substance of plaintiff's claim as well as defendants' qualified immunity defense. Accordingly, defendants' motion for summary judgment on this claim should be denied.

VI.  <u>Recommendation</u>

Pursuant to the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 69) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 11, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

nels1289.msj

27